UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOSE RODRIGUEZ, JR.,

        Plaintiff,                Case No. 2:11-cv-515

v.                                  Honorable Gordon J. Quist

JEFFREY STEVIE, et al.,

        Defendants.
_____/

# REPORT AND RECOMMENDATION

Plaintiff Jose Rodriguez, Jr., an inmate currently confined at the Macomb Correctional Facility, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Jeffrey Stevie, M.D., Prison Health Services, Inc. (PHS), Lawrence Pomeroy, Craig Hutchinson, Susan Wilson, P.A., Jeannie Stephenson, R.N., R.H.A.A., and Terry Malloy R.H.A.

Plaintiff's complaint alleges that he was told that he suffered from Hepatitis C in 2008, while he was confined at the Thumb Correctional Facility. In November of 2009, he was transferred to the Kinross Correctional Facility (KCF). Plaintiff claims that he repeatedly requested treatment for his Hepatitis C for a period of three years, to no avail.

Plaintiff claims that Defendants' actions violated his rights under the Eighth Amendment to the United States Constitution, as well as his rights under state law. Plaintiff seeks nominal, compensatory and punitive damages, as well as declaratory and injunctive relief.

Presently before the Court are Defendants' Motions for Summary Judgment filed pursuant to Fed. R. Civ. P. 56 (docket #29 and #32). Plaintiff has filed a response and the matter is

ready for decision. Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Defendants contend that Plaintiff did not exhaust his administrative remedies against Defendant Malloy because he did not name Defendant Malloy in a grievance regarding the issues asserted in his complaint. Pursuant to the applicable portion of the Prison Litigation Reform Act (PRLA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S.

516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007); *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 127 S. Ct. at 922-23.

MDOC Policy Directive 03.02.130 (effective July 9, 2007), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶ P. The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly. Information provided shall be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original). The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ X.

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the

response, or if no response was received, within ten days after the response was due. *Id.* at ¶¶ T, DD. The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a medical care grievances. *Id.* at ¶ GG. If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III. *Id.* at ¶ FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ X. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall be completed within 90 calendar days unless an extension has been approved . . . ." *Id* at ¶ HH.

In support of this claim, Defendants offer the affidavit of Richard Russell, Manager of the Grievance Section of the Michigan Department of Corrections, as well as the Step III Grievance Report for Plaintiff. According to these documents, Plaintiff filed five grievances at step III since May of 2009. Four of the grievances have been responded to and one is still listed as pending. (Docket #30-6 and #30-7.) Defendants also offer copies of the four completed grievances, none of which name Defendant Malloy. (Docket ##30-8 through 30-11.) As noted above, MDOC policy requires that the "names of all those involved in the issue being grieved are to be included" in the grievance. *Id.* at ¶ R (emphasis in original). Therefore, Defendant Malloy is entitled to summary judgment for failure to exhaust administrative remedies.

Defendants Stieve, Malloy, Stephenson and Pomeroy also assert that they are entitled to summary judgment because they were not personally involved in the alleged misconduct. Liability under Section 1983 must be based on more than merely the right to control employees.

*Polk Co. v. Dodson*, 454 U.S. 312, 325-26 (1981); *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). Thus, Section 1983 liability cannot be premised upon mere allegations of *respondeat superior*. *Monell*, 436 U.S. at 691; *Polk*, 454 U.S. at 325. A party cannot be held liable under Section 1983 absent a showing that the party personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the allegedly unconstitutional conduct. *See e.g. Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989), *cert. denied*, 495 U.S. 932 (1990); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir.), *cert. denied*, 459 U.S. 833 (1982). *See also Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied* 469 U.S. 845 (1984).

Supervisory officials can be held liable for the acts of their subordinates only if plaintiff establishes that the supervisor failed to appropriately discharge his supervisory duties, and that this failure resulted in a denial or deprivation of plaintiff's federal rights. *See e.g. Leach*, 891 F.2d at 1246; *Hayes v. Vessey*, 777 F.2d 1149, 1154 (6th Cir. 1985). However, the failure of a supervisor to supervise, control or train the offending employee is not actionable absent a showing that the official implicitly encouraged, authorized, approved or knowingly acquiesced in, or in some other way directly participated in, the offensive conduct. *Leach*, 891 F.2d at 1246. Such a claim requires, at a minimum, that the official had knowledge of the offending employee's conduct at a time when the conduct could be prevented, or that such conduct was otherwise foreseeable or predictable. *See e.g. Gibson v. Foltz*, 963 F.2d 851, 854 (6th Cir. 1992). In addition, plaintiff must show that defendant had some duty or authority to act. *See e.g. Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989) (lower level official not liable for shortcomings of building); *Ghandi v. Police Dept. of City of Detroit*, 747 F.2d 338, 351 (6th Cir. 1984) (mere presence at the scene is insufficient grounds to impose Section 1983 liability in the absence of a duty to act); *accord Hall v. Shipley*, 932 F.2d 1147 (6th Cir. 1991). In addition, merely bringing a problem to the attention of a supervisory

official is not sufficient to impose such liability. *See Shelly v. Johnson*, 684 F. Supp. 941, 946 (W.D. Mich. 1987) (Hillman, C.J.), *aff'd* 849 F.2d 228 (6th Cir. 1988). Finally, supervisory liability claims cannot be based on simple negligence. *Leach*, 891 F.2d at 1246; *Weaver v. Toombs*, 756 F. Supp. 335, 337 (W.D. Mich. 1989), *aff'd* 915 F.2d 1574 (6th Cir. 1990).

Defendant Stieve has been employed as the Chief Medical Officer for the MDOC since November of 2008. Prior to that date, Defendant Stieve was employed as the Regional Medical Officer for the Northern Region. Defendant Stieve attests that his duties include reviewing MDOC Bureau of Health Care Services policies and procedures, and responding to questions and concerns regarding the procedures. Defendant Stieve is also responsible for chairing various committees and for assisting the Director of the MDOC on budget and process issues. (Docket #30-2, ¶¶ 1-2.) Defendant Stieve did not provide direct care to Plaintiff and had no involvement with the scheduling, canceling, or rescheduling of Plaintiff's appointments with the MDOC's contract Infectious Disease Specialist. Defendant Stieve further notes that the Infectious Disease Specialist makes the determination of which patients are to be treated and when the treatment should begin. (Docket #30-2, ¶¶ 4-5.) Finally, Defendant Stieve attests that in December of 2010, he was asked to review Plaintiff's case in relation to his Hepatitis C status and the rescheduling of his Infectious Disease Specialist appointments. Defendant Stieve briefly reviewed Plaintiff's electronic medical record and referred the matter to the Infectious Disease Specialist. (Docket #30-2, ¶ 7.)

Defendant Stephenson was employed by the MDOC as a Clinical Administrative Assistant at the Northern Region Office until November of 2011. As part of her duties, Defendant Stephenson responded to step II grievance appeals filed against health care personnel. Defendant Stephenson completed a step II response to Plaintiff's grievance number KCF-11-01-0038-12d1. In grievance number KCF-10-08-1070-12d2, Plaintiff named Defendant Stephenson in his step I

grievance, but merely makes a conclusory assertion that she violated his Eighth Amendment rights. In response to this assertion, Defendant Stephenson responded to the grievance by stating she had nothing to do with the authorization or denial of patient care. (Docket #30-3, ¶¶ 1, 5-6; docket #30-9 and #30-10.) In Plaintiff's step III appeal to KCF-10-08-1070-12d2, he offered a letter written by Defendant Stephenson on March 26, 2010. In the letter, Defendant Stephenson indicated that she had been asked to respond to Plaintiff's grievance against Defendant Malloy with regard to the delay in Plaintiff's exam and blood work by specialist Dr. Hutchinson. Defendant Malloy reviewed Plaintiff's medical records as part of the response and informed Plaintiff that his appointment had been rescheduled for the beginning of April. (Docket #30-9, March 26, 2010, Stephenson letter.)

Defendant Pomeroy attests that he is a corporate officer of Corizon, Inc., formerly known as Prison Health Services, Inc. Defendant Pomeroy does not provide medical care to inmates in Michigan and has never treated Plaintiff. Nor does Defendant Pomeroy recollect having any contact with Plaintiff, and had no involvement with Plaintiff's care. (Docket #36, ¶¶ 3-7.)

Finally, Defendants note that Plaintiff fails to even mention Defendant Malloy in the body of his complaint. Defendant Malloy attests that as Regional Health Administrator for the Northern Region, she did not have any involvement with Plaintiff's treatment, testing, or specialty services. (Docket #30-4, ¶ 1.)

Nothing in the record shows that Defendants Stieve, Malloy, Stephenson and Pomeroy were personally involved in the activity which forms the basis of his claim. The only roles that Defendants Stieve, Malloy, Stephenson and Pomeroy had in this action involve the denial of administrative grievances or the failure to act. Defendants Stieve, Malloy, Stephenson and Pomeroy cannot be liable for such conduct under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.

1999), *cert. denied*, 530 U.S. 1264 (2000). Accordingly, the Court concludes that Defendants Stieve, Malloy, Stephenson and Pomeroy are entitled to summary judgment.

Defendants PHS, Pomeroy, Hutchinson and Wilson contend that they are entitled to summary judgment on Plaintiff's Eighth Amendment claims because they were not deliberately indifferent to a serious medical need. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867

(6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the

treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

In support of this claim, Defendants PHS, Pomeroy, Hutchinson and Wilson offer a copy of Plaintiff's medical records for the pertinent time period, which was filed under seal as Exhibit A to their motion for summary judgment. Defendants also offer the affidavit of Defendant Wilson as Exhibit C. Plaintiff alleges that he was transferred to the Kinross Correctional Facility (KCF) in November of 2009. A note dated November 10, 2009, indicated that Plaintiff, who was a recent transfer, might be receiving Hepatitis C treatment. The note also stated that Plaintiff was to be seen by a nurse on November 13, 2009, and by a medical service provider on November 30, 2009. (Docket #32, Exhibit A, p. 243; Exhibit C.) Defendant Wilson saw Plaintiff in the Gastrointestinal Chronic Care Clinic on November 30, 2009, and reported that had had a liver biopsy, was at stage 3 or 4 for fibrosis, and that he needed to be rescheduled for a tele-med appointment in the not too distant future. Defendant Wilson ordered lab work and vital sign checks and scheduled a follow up appointment for January of 2010. (Docket #32, Exhibit A, pp. 223-229; Exhibit C.) On January 21, 2010, Defendant Wilson noted: "CR e-mailed Dr. Hutchinson ID [infectious disease] physician, elevation in AFP due to fibrosis of liver, per his response." (Docket #32, Exhibit A, p. 209.) On January 25, 2010, Defendant Wilson saw Plaintiff in the Infectious Disease Chronic Care Clinic. Defendant Wilson noted that Plaintiff had stage 3 fibrosis and was

awaiting his infectious disease consult. Defendant Wilson ordered follow up labs and a urinalysis to address Plaintiff's urinary related complaints. (Docket #32, Exhibit A, pp. 205-208; Exhibit C.)

On April 13, 2010, Plaintiff sent a kite regarding his appointment with Defendant Hutchinson, which was supposed to be that morning. Plaintiff was told that there was a problem with the tele-med equipment and that a delay in the appointment would not cause him undue harm. (Docket #32, Exhibit A, p. 195.) On April 23, 2010, Plaintiff was told that his appointment with Defendant Hutchinson was scheduled for the end of June via tele-med. (Docket #32, Exhibit A, p. 196.) On July 1, 2010, Plaintiff had a Chronic Care appointment with Defendant Wilson, and stated that he was concerned because his tele-med appointment had been cancelled again. (Docket #32, Exhibit A, pp. 193-194.) On July 11, 2010, Plaintiff kited regarding his appointment with Defendant Hutchinson. Plaintiff was told that it would be rescheduled and that he would be notified of the new appointment. (Docket #32, Exhibit A, p. 190.) On August 3, 2010, Plaintiff kited regarding his appointment with Defendant Hutchinson and was told that it had been scheduled for August 19, 2010. (Docket #32, Exhibit A, p. 187.)

On September 1, 2010, a urinalysis was ordered and Plaintiff was seen by Nurse Practitioner Penny Rogers, who performed a prostate examination and noted that Plaintiff had urination issues. (Docket #32, Exhibit A, pp. 182-185.) On September 13, 2010, Nurse Practitioner Rogers received Plaintiff's urinalysis results, ordered medication for Plaintiff and took another urine sample. (Docket #32, Exhibit A, pp. 176-179.) On September 19, 2010, Defendant Wilson saw Plaintiff for Chronic Care Clinic and noted that his infectious disease appointment had been cancelled again, but that it had been rescheduled for November of 2010. (Docket #32, Exhibit A, pp. 170-173.) On October 10, 2010, Plaintiff was seen by a nurse and declined headache medications without checking with Defendant Hutchinson. (Docket #32, Exhibit A, pp. 167-169.)

Defendant Wilson noted Plaintiff's refusal of headache medication and requested a nursing follow-up. (Docket #32, Exhibit A, p. 165.) On October 20, 2010, Plaintiff was seen by a nurse for urinary issues. (Docket #32, Exhibit A, p. 161.) On November 24, 2010, Defendant Hutchinson noted that he attempted the tele-med appointment, but that he could not get an answer at the health care clinic. (Docket #32, Exhibit A, p. 155.)

On January 6, 2011, Plaintiff kited regarding the cancellation of his appointment with Defendant Hutchinson, and was told that it had been rescheduled for March of 2011. Plaintiff also complained that he continued to suffer from urinary problems. (Docket #32, Exhibit A, pp. 150-152.) On January 28, 2011, Plaintiff was seen by nursing staff, who obtained a urine sample and scheduled Plaintiff to see Defendant Wilson. (Docket #32, Exhibit A, p. 149.) On February 18, 2011, Defendant Wilson saw Plaintiff and noted that he was still waiting for the infectious disease clinic and had had a liver biopsy in 2009. (Docket #32, Exhibit A, pp. 145-147.)

On March 15, 2011, Defendant Hutchinson saw Plaintiff via tele-med and noted that his Hepatitis C genotype 3a was determined on January 7, 2009. Defendant Hutchinson further noted that Plaintiff had undergone an ultrasound guided percutaneous liver biopsy in June of 2009, which showed inflammation graded at 2 out of 4, and fibrosis staged 3 out of 4. Defendant Hutchinson stated that prostatic hypertrophy was likely considering Plaintiff's urinary tract problems. Defendant Hutchinson opined that Plaintiff's urinary symptoms were dramatic enough that it would be difficult for Plaintiff to tolerate the Hepatitis C treatment, so that Plaintiff's urinary problems should be addressed first. Defendant Hutchinson ordered a two week trial of Ciprofloxacin 500 mg by mouth twice a day, Cardura 1 mg by mouth, and a follow up tele-med appointment three to four months later. Defendant Hutchinson noted that Plaintiff's earliest release date was April 27, 2018, so that there was no danger of running out of time to get the Hepatitis C treatment completed.

Defendant Hutchinson further noted that there was no urgency for the treatment, which could be done sometime in the next one to two years. (Docket #32, Exhibit A, pp. 142-143; Exhibit B (Defendant Hutchinson Affidavit), ¶¶ 13-14.)

On March 28, 2011, Defendant Wilson noted that Plaintiff had been started on the new medication and would have a tele-med follow up in three to four months. (Docket #32, Exhibit A, p. 141.) On June 14, 2011, Jody M. Krause, L.P.N., took Plaintiff's vitals in preparation for a tele-med appointment, but the appointment did not take place. (Docket #32, Exhibit A, p. 140.) On July 14, 2011, Penny Filion, R.N., noted that Plaintiff was suffering from cysts on his right arm and axilla, as well as on his mid chest. Nurse Filion also noted that Plaintiff's follow up tele-med appointment had not occurred and that this needed to be addressed. (Docket #32, Exhibit A, p. 134.) On July 20, 2011, Defendant Wilson saw Plaintiff regarding the cysts and his urinary issues. Plaintiff indicated that the Cardura was not helpful, so Defendant Wilson increased the dosage. (Docket #32, Exhibit A, pp. 130-133.) On August 10, 2011, Defendant Wilson saw Plaintiff for his annual health screening and chronic care visit. Plaintiff informed Defendant Wilson that he had gone from getting up about ten times a night, to only getting up three to four times a night following the increased dosage of Cardura. Defendant Wilson also noted that Plaintiff continued to await possible treatment for Hepatitis C and an infectious disease tele-med appointment. (Docket #32, Exhibit A, pp. 121-128.)

On August 22, 2011, Plaintiff kited regarding his next appointment with Defendant Hutchinson and was told that the prison did not do the scheduling. (Docket #32, Exhibit A, p. 119.) On September 13, 2011, Plaintiff was seen by Jody M. Krause, L.P.N., for a health assessment. (Docket #32, Exhibit A, p. 118.) On October 5, 2011, and November 9, 2011, Plaintiff kited regarding his next appointment with Defendant Hutchinson. On November 10, 2011, Plaintiff was

informed that the visit had been rescheduled by Defendant Hutchinson. (Docket #32, Exhibit A, pp. 113, 115-116.)

On January 8, 2012, Plaintiff had further lab work done. On January 11, 2012, Plaintiff signed a tele-med consent form. On January 11, 2012, Defendant Hutchinson saw Plaintiff via tele-med and ordered further blood work concerning Plaintiff's Hepatitis C viral load in order to confirm Plaintiff's viremia. Plaintiff informed Defendant Hutchinson that his prostate symptoms were much improved. Defendant Hutchinson noted that Plaintiff had a chronic Hepatitis C infection with genotype 3a and a June 26, 2009, liver biopsy reporting grade 2 and stage 3 of 4. Defendant Hutchinson further noted that Plaintiff's GERD (gastric esophageal reflux disease) control was acceptable and that he was ready to begin treatment. Defendant Hutchinson told Plaintiff that once his viremia was confirmed, he could begin treatment, with a follow up tele-med visit in three months. As treatment, Defendant Hutchinson recommended PEG-Intron 150 mg S.C. per week on Saturdays to accommodate Plaintiff's work schedule, Ribavirin 600 mg at noon and 400 mg at night, and acetaminophen 650 mg three times a day for two days after each PEG-Intron dose for twenty-four weeks. (Docket #32, Exhibit A, pp. 103-109, 111-112; Exhibit B, ¶¶ 15-16.)

On January 18, 2012, Defendant Wilson performed a chart update and scheduled an appointment for January 27, 2012, to set up Plaintiff's treatment schedule. Defendant Wilson also referred Plaintiff for regular mental health visits during his Hepatitis C treatment. (Docket #32, Exhibit A, pp. 100-102.) On January 27, 2012, Defendant Wilson saw Plaintiff and explained the treatment for Hepatitis C, stating that it would begin in one week. Defendant Wilson also ordered the appropriate medications and labs. (Docket #32, Exhibit A, pp. 94-98.) On January 30, 2012, Plaintiff received the mental health screening required to begin treatment. Plaintiff began treatment on February 10, 2012, and lab work was done on February 6, 2012, and February 13, 2012. (Docket

#32, Exhibit A, pp. 84-92.) On February 17, 2012, Plaintiff was seen by Defendant Wilson, was given a treatment, and was scheduled for more lab work. (Docket #32, Exhibit A, pp. 81-83.)

On February 23, 2012, transfer orders were received for Plaintiff. Defendant Wilson called the new facility in order to notify officials there of Plaintiff's treatment information and the need to continue Hepatitis C treatment. (Docket #32, Exhibit A, pp. 75-77.) On February 23, 2012, Plaintiff was transferred to the Earnest C. Brooks Correctional Facility (LRF) and was seen by health care. Plaintiff's medications were ordered and he received a treatment on February 24, 2012. Plaintiff continued with his Hepatitis C treatment as ordered at LRF. (Docket #32, Exhibit A, pp. 6, 8-17, 24, 26-34, 38-43, 46-49, 57-58, 67, 69, 70-74.)

On April 23, 2012, Plaintiff had a tele-med appointment with Defendant Hutchinson, who changed Plaintiff's treatment schedule in order to accommodate Plaintiff's new work schedule. Defendant Hutchinson noted that on March 6, 2012, following Plaintiff's fifth dose of treatment, his viral load was undetectable at less than 615 IU/mL by bDNA. Defendant Hutchinson recommended that Plaintiff finish the treatment despite his minor health issues. (Docket #32, Exhibit A, pp. 20-23, Exhibit B, ¶ 17.) On April 24 and 25, 2012, Plaintiff was seen by Jill C. Britton, R.N., to follow-up on Defendant Hutchinson's orders. Nurse Britton noted that Plaintiff was tolerating the treatments well, with minimal side effects. (Docket #32, Exhibit A, pp. 18-19.) Plaintiff completed his Hepatitis C treatment in mid-July of 2012. Defendant Hutchinson notes that although the final outcome of treatment will not be known until January of 2013, Plaintiff's response during treatment was favorable. (Docket #32, Exhibit B, ¶ 18.)

Defendant Hutchinson attests that in patients with Hepatitis C, it takes eight to ten years for liver scarring to go from one stage to another, and that treatment at any time during this period is sufficient to address the condition and prevent substantial worsening. Defendant

- 15 -

Hutchinson notes that Plaintiff's liver biopsy shows that he was at Stage 3 in June of 2009. Typically patients do not feel significant pain at Stage 3 and progression beyond Stage 3 in three years is very unlikely. Defendant Hutchinson states that if he had believed that Plaintiff was in danger of progressing to Stage 4, he would have fast-tracked Plaintiff's treatment. After Defendant Hutchinson's first tele-med appointment with Plaintiff, he thought that Plaintiff might have chronic prostatitis and prescribed antibiotics and Cardura to treat the symptoms. In Defendant Hutchinson's experience, poorly controlled pre-treatment symptoms are magnified during treatment, risking premature termination of the treatment. (Docket #32, Exhibit B, ¶¶ 19-22.) Defendant Hutchinson attests that his treatment of Plaintiff was in accordance with the American Association for the Study of Liver Diseases (AASLD) guidelines, which states that treatment can be deferred for years without detriment to the patient's condition and successful outcome. (Docket #32, Exhibit B, ¶¶ 27-28.)

It is clear from the record, that Plaintiff received treatment for his Hepatitis C. As noted above, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer*, 62 F.3d at 154-55; *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). Because the record shows that Defendants PHS, Pomeroy, Hutchinson and Wilson were not deliberately indifferent to Plaintiff's medical needs, they are entitled to summary judgment.

Finally, Defendants assert that Plaintiff's claim for breach of contract between the MDOC and PHS is a state law claim, and that the court should decline to exercise pendent jurisdiction. To the extent that Plaintiff is claiming his state law rights were violated, it is recommended that this court refuse to exercise pendent jurisdiction over such claims. Claims raising issues of state law are best left to determination by the state courts, particularly in the area of prison administration. In addition, pendent jurisdiction over state law claims cannot be exercised after all

federal claims have been dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-727, 86 S. Ct. 1130, 1139 (1966); *Moon v. Harrison Piping Supply, et al.*, No. 05-1808, ___ F.3d ___ (6th Cir. Sep. 28, 2006); *Smith v. Freland*, 954 F.2d 343, 348 (6th Cir.), *cert. denied*, 504 U.S. 915, 112 S.Ct. 1954 (1992).

> That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726-727, 86 S. Ct. 1130, 1139 (1966).

In summary, in the opinion of the undersigned, Plaintiff has failed to sustain his burden of proof in response to Defendants' motions for summary judgment. Accordingly, it is recommended that Defendants' Motions for Summary Judgment (Docket #29 and #32) be granted and that this case be dismissed in its entirety.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and

recommendation and should Plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: May 14, 2013